## D. F. Morton *v*. The State.

1. Verdict. — It is not necessary, but is believed to be advisable and usual, that the verdict in a felony case be signed by the foreman of the jury.

2. Record — Names of Petit Jurors. — The record entry of a judgment rendered on a verdict need not set forth the names of the jurors.    If objection, however, was taken to any of the jurors, it is advisable to set out the names of all of them.

3. Freedom of the Press — Libel. — The law of this state defining and punishing libelous publications is not in derogation of the freedom of the press, nor violative of the constitutional provisions which secure to every person the right to "speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege," and which prohibit the enactment of any law curtailing the liberty of speech or of the press.

4. Same. — Note the distinction between laws to punish libelers and laws curtailing the liberty of the press by subjecting it to censorship or license before publication, and see the opinion *in extenso* upon the statutory law of libel in this state.

Appeal from the Criminal District Court of the county of Galveston.    Tried below before the Hon. G. Cook.

The indictment charged that the appellant, "on the 21st day of the month of May, A. D. 1876, in the said county of Galveston, in the state of Texas, with force and arms, then and there being a person of envious, evil, malicious, and wicked mind, and of a most malicious disposition, and then and there unlawfully, willfully, and maliciously minding, contriving, and intending, as far as in him lay, to injure, oppress, and vilify one William Boyd, he, the said William Boyd, then and there being an alderman of the city of Galveston, and a good, peaceable, reputable, and worthy citizen of said state, and then and there being an officer of the said city of Galveston, to wit, an alderman of the said city, and to bring him, the said William Boyd, into public scandal, hatred, infamy, and disgrace, then and there of his, said Daniel F. Morton's malice, hatred, and ill-will towards said William Boyd, unlawfully, willfully, and maliciously, and with intent to injure him, said William Boyd, and with the intent then and there to injure the reputation of said William Boyd, then and there did maliciously make, publish, and circulate, in a certain newspaper entitled *The Commoner*, the said Daniel F. Morton then and there being the editor and proprietor of said newspaper called *The Commoner*, certain false, scandalous, and defamatory, and malicious statements of and concerning said William Boyd, and then and there affecting the reputation of said William Boyd, conveying that said William Boyd had been guilty of the penal offenses of murder and of embezzlement, and that he, the said William Boyd, had been guilty of acts disgraceful to him as a member of society, the natural consequence of which being to bring him into contempt among honorable persons; and, further, that said William Boyd, while in office as alderman of the city of Galveston, was dishonest, and, therefore, unworthy of such office, containing therein the false, malicious, defamatory, and libelous words, figures, and matters following, that is to say: "

The indictment then set out the libelous publication *in hæc verba*, with the necessary innuendoes to show its meaning and application, and concluded " to the great damage, disgrace, scandal, and infamy of him, said William Boyd, and against the peace and dignity of the state."

The jury found the defendant guilty, and assessed his punishment at a fine of $250.

*Howard Finley*, for the appellant.

*George McCormick*, Assistant Attorney General, for the State.

White, J.    There is no statement of facts, bill of exceptions, or assignment of errors appearing in the transcript. The case being a misdemeanor, this court might well decline to take any action upon the appeal further than to ascertain whether the indictment would sustain the findings of the jury.    *Mahl* v. *The State*, 1 Texas Ct. App. 127 ; *Goode* v. *The State*, 2 Texas Ct. App. 520.

It is objected, however, in the brief of counsel, to the verdict that it is not signed by the foreman of the jury, and to the judgment that it does not set out and recite the names of the jurors who tried the case.    Whilst our statute requires the jury to appoint a foreman, in order that their deliberations may be conducted with regularity and order (Pasc. Dig., art. 3076), and seems to contemplate that the verdict in criminal cases shall be in writing, because it provides that, " when the jury have agreed upon a verdict, they shall be brought into court by the proper officer, and, if when asked they answer they have agreed, the verdict shall be read aloud by the clerk " (Pasc. Dig., art. 3088), yet we know of no express provision requiring the verdict to be signed by the foreman, though that undoubtedly would be the better practice, and it has become, we believe, almost the uniform practice throughout the state.    In the absence

of any such provision we think the reasoning of the court in *Burton* v. *Bondies* establishes the proper rule.

In that case Mr. Justice Wheeler says: "We are not aware of any rule of the common law, or of any statute, which requires a verdict to be signed. That is not an ingredient in the definition of a verdict, which is: The answer of a jury given to the court concerning the matter of fact in any case committed to their trial. 6 Jac. Law Dic. 340. And signing is not believed to be a requisite, or essential to its validity. Such was the opinion of the Supreme Court of Kentucky in *The Commonwealth* v. *Ripperdon*, Litt. Sel. Cas. 195, where they express it as their opinion that there is no law which requires the verdict of a petit jury, either in a criminal or civil case, to be signed; and that it would be, beyond doubt, good without it." 2 Texas, 203.

In Iowa, where it seems they have a statute which requires that the verdict shall be signed, Judge Dillon, in the case of *Morrison* v. *Overton*, says: "The sole objection [to the verdict] is that it is not signed. Section 3070 of the Revision of 1860 directs the verdict to be signed, and this is the correct practice. But the section is directory, not imperative. If a verdict is returned into open court, and there received from the jury, could it be claimed that it was fatally defective because it was not signed? Certainly not." 20 Iowa, 465.

The only cases wherein the verdict of a jury is absolutely required to be signed at all are those mentioned in section 13 of article 5 of the Constitution, and section 19 of "An act to regulate grand juries and juries in civil and criminal cases in the courts of the state," approved August 1, 1876. The constitutional provision is in this language: "In trials of civil cases, and in trials of criminal cases below the grade of felony, in the District Courts, nine members of a jury concurring may render a verdict, but when the verdict shall be rendered by less than the whole number it shall be signed

by every member of the jury concurring in it," etc.  Const., art. 5, sec. 13.   The statute referred to reads thus :

" Sec. 19.  No verdict shall be rendered in any cause in the District Court whereby the rights of any citizen shall be affected, except upon the concurrence of all the jury (unless during the trial one or more of the jurors, not exceeding three, may die, or be disabled from sitting, in which event the remainder of the jury shall have power to render the verdict), but when the verdict shall be rendered by less than the whole number it shall be signed by every member of the jury concurring in it."   Gen. Laws Fifteenth Legislature, 82.

Nor does our statute anywhere require that the judgment should recite in full the names of the jurors who sat upon the trial ; and the practice which has obtained in this regard does not appear to be uniform.   In some courts, especially in felony cases, they are set out in full ; in others the name of the foreman is given, reciting the fact that eleven others sat with him ; and in others the judgment simply recites that a jury of twelve good and lawful men were impaneled and sworn.   We think the best and safest practice, perhaps, would be to set out the name of the foreman, except in cases where some particular objection is urged to one or more of the individual jurors, in which event, in our opinion, it would be well to set out all the names in full.

Our Supreme Court have held, in civil cases, that it was not necessary for the names of the jurors to be set out in the record in each case.   *Clark* v. *Davis*, 7 Texas, 556. And, again, it has been held in civil cases that, where it appeared from the record that twelve jurors sat upon the trial of a case, but the names of eleven only were given, it was no ground for error.   *Foster* v. *Van Norman*, 1 Texas, 636 ; *Marlin* v. *Stockbridge*, 14 Texas, 165.   In this court, in felony cases, the rule has been held to be otherwise, and where but eleven names were set out it was said that it could

not be inferred or presumed that the accused was tried by a full jury. *Rich* v. *The State*, 1 Texas Ct. App. 206; *Huebner* v. *The State, ante,* 458.

In the case we are considering, the appellant, Daniel F. Morton, was indicted, tried, and convicted for maliciously publishing, making, and circulating a libel against one William Boyd, a member of the Board of Aldermen in the city of Galveston, in a certain newspaper, entitled *The Commoner,* of which defendant was the editor and proprietor.

It has been wisely provided in our Constitution that " every person shall be at liberty to speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege ; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence." Bill of Rights, art. 1 ; Const., sec. 8.

A great deal has been said about, and written upon, the liberty of the press. By a great many the character of that liberty does not seem to be well understood ; and it has been a subject fruitful of much discussion as to how far the legislative power of the government can go in limiting, abridging, and restraining that liberty, under constitutional provisions similar to the one above quoted.

Without attempting a review of the authorities, we know of no better exposition of the subject, nor one more happily expressed, than that of Mr. Justice Blackstone in his Commentaries upon the Laws of England. Mr. Justice Story says: " The doctrine laid down by Blackstone, respecting the liberty of the press, has not been repudiated (as far as is known) by any solemn decision of any of the state courts in respect to their own municipal jurisprudence.

On the contrary, it has been repeatedly affirmed in several of the states, notwithstanding their Constitutions or laws recognize that 'the liberty of the press ought not to be restrained,' or, more emphatically, that 'the liberty of the press shall be inviolably maintained.' " Story on Const., sec. 1883.

Mr. Blackstone says that, in passing laws in regard to libels and punishing libelers, " *the liberty of the press*, properly understood, is by no means infringed or violated. The liberty of the press is, indeed, essential to the nature of a free state ; but this consists in laying no previous restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public ; to forbid this is to destroy the freedom of the press ; but, if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity. To subject the press to the restrictive power of a licenser, as was formerly done both before and since the Revolution, is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government.

" But to punish, as the law does at present, any dangerous or offensive writings which, when published, shall, on a fair and impartial trial, be adjudged of a pernicious tendency, is necessary for the preservation of peace and good order, of government and religion, the only solid foundation of all liberty. Thus, the will of individuals is still left free ; the abuse only of that free will is the object of legal punishment. Neither is any restraint hereby laid upon freedom of thought or inquiry ; liberty of private sentiment is still left. The disseminating or making public of bad sentiments, destructive of the ends of society, is the crime which society corrects. A man (says a fine writer on this subject) may be allowed to keep poisons in his closet, but not publicly vend them as

cordials. And to this we may add that the only plausible argument heretofore used for the restraining the just freedom of the press, 'that it was necessary to prevent the daily abuse of it,' will entirely lose its force when it is shown (by a seasonable exertion of the law) that the press cannot be abused to any bad purpose without incurring a suitable punishment; whereas it never can be used to any good one when under the control of an inspector. So true will it be found that to censure the licentiousness is to maintain the liberty of the press." Bla. Com., b. 4, side p. 152

And Judge Story himself says that to hold that the licentiousness of the press could not be restrained and punished under penal laws would be to hold a monstrous doctrine, tantamount to "the prostration of all personal liberty, all private peace, all enjoyment of property and good reputation. These are the great objects for which government is instituted; and, if the licentiousness of the press must not only endanger these, but all public rights and public liberties, is it not as plain that the right of the government to punish the violators of them (the only mode of redress which it can pursue) flows from the primary duty of self-preservation? No one can doubt the importance, in a free government, of a right to canvass the acts of public men, and the tendency of public measures, to censure boldly the conduct of public rulers, and to scrutinize closely the policy and plans of the government. This is the great security of a free government. If we would preserve it, public opinion must be enlightened; political vigilance must be inculcated; free, but not licentious, discussion must be encouraged. But the exercise of a right is essentially different from an abuse of it. The one is no legitimate inference from the other. Common sense here promulgates the broad doctrine *sic utere tuo ut non alienum lœdas* — so exercise your own freedom as

not to infringe the rights of others or the public peace and safety.'' Story on Const., sec. 1881.

In harmony with this well-established doctrine our law-givers have, as we think wisely, provided that he may be legally punished criminally, and is guilty of a libel, '' who, ·with intent to injure, makes, writes, prints, publishes, sells, or circulates any malicious statement affecting the reputation of another, which conveys the idea (1) that the person to whom it refers has been guilty of some penal offense ; or (2) that he has been guilty of some act or omission which, though not a penal offense, is disgraceful to him as a member of society., and the natural consequence of which is to bring him into contempt among honorable persons ; or (3) that he has some moral vice or physical or mental defect or disease which renders him unfit for intercourse with respectable society, and such as should cause him to be generally avoided ; or (4) that he is notoriously of bad or infamous character ; or (5) that any person in office, or a candidate therefor, is dishonest, and therefore unworthy of such office, or that while in office he has been guilty of some malfeasance rendering him unworthy of the place.'' Pasc. Dig., arts. 2276, 2282.

The offense is properly separated and distinguished from just and legitimate criticism ; for it is also declared that '' it is no offense to make true statements of facts, or express opinions, as to the integrity or other qualifications of a candidate for any office or public place or appointment.'' Pasc. Dig., art. 2290. Again : '' It is no offense to publish true statements of facts as to the qualifications of any person for any occupation, profession, or trade.'' Pasc. Dig., art. 2291. And it is further expressly provided that '' in the following cases the truth of any statement charged as a libel may be shown in justification of the defendant : 1. When the publication purports to be an investigation of the official

conduct of officers and men in a public capacity. 2. When it is stated in the libel that a person has been guilty of some penal offense, and the time, place, and nature of the offense is specified in the publication. 3. When it is stated in the libel that a person is of notoriously bad or infamous character. 4. When the publication charges any person in office, or a candidate therefor, with a want of honesty, or of having been guilty of some malfeasance in office, rendering him unworthy of the place." Pasc. Dig., art. 2302.

In the case at bar we see nothing in the record which calls for or would warrant us in reversing the judgment. The indictment is sufficient; the charge of the court presented the law fairly and fully; and, in the absence of a statement of facts, we will presume that the evidence abundantly sustained the verdict and judgment.

The judgment of the lower court is, therefore, affirmed.
*Affirmed.*